We'll move to argument next. Number 21 6 21 Rucker v. Kijakazi. Good morning. Good morning, Your Honor. May it please the court. Jessica Rucker, in this case, has applied for disability on the basis, essentially, of her psychiatric impairments, which are exacerbated by her low intellect because she doesn't understand things. She has, throughout this period, she has, what she's done clearly indicates she can't work. She hit herself on the head with a ceramic bowl. She attempted to cut herself with a knife. She stabbed her boyfriend with scissors. She wants to blow her aunt's head off. She has blackouts from anxiety because of the thought that she might have to go back to work. She stays in bed for weeks. She wants to end her life. She hears voices. She's fine until she explodes because she she's fine until she explodes because she misinterprets something. I want to use one example from the record that addresses, I think, three of the points that the defendant makes. And that the defendant states that she herself denies her psychiatric impairments, that the treating doctor said she could work, and that she's only been hospitalized 17 days. What I want to use is the December 16th through April 17th. What happened is she thinks that her treating providers, Megan Hagelmeier, I can't pronounce their names, and the psychiatrist Merza, she thinks they want her to work. She stays in bed and obsesses over this for three months. Oh, my God, I'm going to have to go to work. She is beside herself. She goes to Dr. Merza, who is a psychiatrist, and who can understand what she sees. And she says to the psychiatrist, you know, no, I'm really not bad. The psychiatrist, from the tone of her voice, from her eyes, from everything, it's not a matter that the psychiatrist disagrees with her that she has no psychiatric impairments. She is so bad, she invokes Mental Hygiene Law 955. You have to go to the hospital. We are going to take you to the hospital because you are a danger to yourself and others. And while she's in there, she repeats, my doctors think I can work. That's not true. The doctors never said that and submitted forms that they didn't. And she's only in there for eight days. But the fact that for three months before she couldn't work shows it's just, it's not a matter of when it's so horrible. Well, anxiety over not wanting to work is not itself a disability. So the disability that you're talking about is her social limitations, like her inability to interact with others. Is that right? Social limitations and her inability to work. The vocational expert said that one day per month absence due to psychiatric impairments or 10% off tasks when she's obsessing over these things prevent all work no matter what the work is. So it's both. Well, the ALJ asked the vocational expert to come up with jobs for someone who should work alone, right? I'm sorry, say again? The ALJ asked for jobs for somebody who would work alone, right? The ALJ gives a very specific residual functional capacity limiting her to simple work. He didn't limit her interaction with supervisors, said that she can't work. Well, he says work alone and only have normal supervision. I mean, you can't eliminate the supervision, I suppose. Right. And when she has any supervision or when she's, and even with others, she said no contact with the public. Well, the public is a problem, but not nearly as bad as when she goes to work and wants to kill herself and stays in bed for three months and has blackouts because she's so- All the jobs she had were involved in interaction with the public. It's not only the interaction, it's all the jobs she had when one of her coworkers or a supervisor would even glance at her the wrong way. They think I'm stupid. They think I can't work. And I certainly think that when I appear before you. But yet, it's a matter of the degree. And the degree is so bad that she tries to cut herself with a knife. She hits herself with a ceramic bowl. She wants to blow her aunt's head off. She sees things. She hears things. She's in the hospital. She's sent to CPAP, which is the psychiatric emergency room of the Binghamton General Hospital, ten times. And 17 days she's in the hospital. And that's the tip of the iceberg. And the fact that she says sometimes, oh, I don't think I have problems, is no different than the paranoid person saying, I'm not paranoid, everybody's out to get me. The agency's decision for substantial evidence, right? So you're saying, well, there's some evidence on the other side, but we shouldn't credit that evidence. I mean, isn't that- There's no evidence. Our position certainly is that there is not. That there is not any credible evidence. That a person who is psychiatrically hospitalized for 17 days. Stacy, Flynn, Estrella, all those cases, they didn't even involve psychiatric hospitals. It's just the person couldn't work. Here, it's so bad. Ten times to the emergency room, 17 days in the hospital, and that is the tip of the iceberg. It's the- What do you mean the tip of the iceberg? Say again? What do you mean the tip of the iceberg? The times that she's in the hospital. She's only in the hospital 17 days. But as I said with the example that I used, where she denied psychiatric symptoms and the doctors looked at her and said she was so bad she had to go to the hospital. It's the three months before that that she stays in bed and couldn't work because she is obsessing over all of these things and can't handle any- It's not even criticism. It's somebody says something and she doesn't understand. It takes it the wrong way and she is gone. She is fine until she is gone. Remind me, do we have- is there a testimony in the record from a treating physician? Yeah. That she can't- that she can work. Not that she can't. What the evidence is, is the hospital records claim and says her treating physician said she can work. That's what she understood from her treating physician that was wrong, which is why she, for three months, stayed in bed and then was hospitalized. The treating physician and the counselor wrote to the judge and said she has marked impairments maintaining a regular schedule. One day absence, 10% off task, no jobs. What relief are you looking for from us? Remand. I mean, certainly we always would take a recalculation for benefits, but no, a remand. It's a medical expert case. It's one where the medical records have got to go to a medical expert. The medical expert has to look at it and say- And a remand for what purpose? To reevaluate and probably get additional evidence. Get a medical expert. Give the proper vocational- There were a number of medical experts in the case. No, no, no. Yeah, but, well, okay. I'm being specific. I didn't understand your answer as to what was Dr. Mirza's recommendation. What did Dr. Mirza conclude? Dr. Mirza concluded that she would have marked, which is defined as more than 33%, limitation in her ability to maintain a regular schedule. And the vocational expert indicated that 10% off task or one day absence per month would preclude every job in the economy. Okay. Thank you very much, Mr. Gordon. Let's turn to the appellee, Ms. Olchen. Thank you. May it please the court. The court should affirm the ALJ's decision because substantial evidence supports the ALJ's assessment of both Ms. Rucker's physical and mental impairments. I'm going to focus on the mental impairments today because that's where Ms. Rucker is focused. This is a case with conflicting evidence. And we acknowledge, as the ALJ acknowledged, that Ms. Rucker has serious longstanding mental impairments and that these have resulted in a number of emergency psychiatric treatments. Not to minimize some of the prior psychiatric treatments, but only three of these were during the relevant period. There were two hospitalizations in 2017 and then one one-day emergency treatment in 2019. But it was the ALJ's responsibility. The fact that they are outside the period that's compensable doesn't mean they're outside of the period that might be pertinent evidence of her condition. Certainly, I would agree that they are still relevant. They are slightly. They're not as relevant as the ones during the relevant period. I'm just clarifying the facts. But they're still a relevant consideration, certainly. But in any event, it was the ALJ's responsibility to determine the effects of these impairments on her functioning based on all the evidence of record. And here, the ALJ weighed the conflicting evidence and ultimately assessed a fairly restrictive mental RFC with social limitations, limitations on the severity and simplicity of the work, limited reading, writing, and math, and then stress limitations. This might not be the only conclusion that the ALJ could have reached based on the record, but that's not the relevant inquiry. The only question is whether it's supported by substantial evidence. And here, there was substantial evidence supporting the ALJ's mental RFC, including the opinions from Dr. Long and Dr. Uriga that Ms. Rucker could perform the requirements of unskilled work. Several years of treatment records reflecting that medications and counseling were generally effective in controlling her symptoms, aside from the emergency times. Well, I mean Dr. Long – I think it – I may be missing something, but it seems to me it's a stretch to say that Dr. Long supported the ALJ's conclusion. I mean Dr. Long, as I remember the record, said she was – cognitive function was borderline or extremely low. Her insight and judgment were poor to fair, which had mild to moderate limitations on a whole bunch of issues, most importantly understanding simple directions and performing simple tasks. Now, you couple that with an individual – and I don't think the record really disputes this – seems to have these pervasive problems with co-workers, with the public, and with her supervisors. So I don't – help me understand why somebody with this constellation of problems is a candidate for the workforce. Well, I'll start with the part of your question that deals with Dr. Long specifically. And there were a number of provisions of her opinion. She said that there were mild to moderate limitations handling simple directions and tasks. She didn't say that Ms. Rucker couldn't do them. She also said that she did appear able to learn some new tasks, that she would have marked limitations handling complex tasks and making appropriate decisions. But the ALJ did limit her in that regard by limiting her to simple tasks and only requiring occasional decisions. She also – borderline personality disorders, some indication of substance abuse, and schizoaffective disorder. What's schizoaffective disorder? What is it? Yeah. Well, in this particular case, I think it – that relates to her experience with paranoia and some of the other symptoms. I think that would be the primary symptom of that impairment here. But Dr. Long said several things about – as regards social skills. I mean, she did say that it was not clear she was relating adequately to others. But that statement is somewhat equivocal. It doesn't include any – it doesn't necessarily translate to specific functional limitations. And the ALJ pointed out that elsewhere in her report, she said that Ms. Rucker was cooperative and that she had good social skills. So – But she's also found to have an RFC that – like the work that she could perform is work that doesn't involve others, right? That's exactly right. So not only did the ALJ provide certain social – So what work might that be? What? What work might that be? Talk to me about work that doesn't involve others. Well, I mean, the specific jobs that the ALJ found that she could perform in this case were hand packager, laundry worker, and industrial cleaner. These are all unskilled jobs. They involve primarily working with things, not with people. There is no contact with the public. But you put in primarily. But primarily doesn't mean not with people. It means primarily not with people. It doesn't mean not with people, not with a supervisor, for example, who judges whether what you've done is satisfactory or not or at least is perceived by the person to do that. Well, the Dictionary of Occupational Titles has ratings for each job. And they have a specific rating for degree of contact with others at the job, the people rating. And that's rated on a scale of 1 to 8, with 8 being the lowest. And all three of these jobs are rated 8, which is the lowest on this scale. It also says that the only involvement with people is taking instructions, helping. This has been recognized. And you're saying there's substantial evidence for a determination that she was able to interact to that limited extent with others? Yes, there was. And the ALJ cited a number of examples. For example, there were Dr. Long's observations that she was cooperative, that she had good social skills. There are the observations from Dr. Mirza. I mean, Dr. Mirza and Dr. and Ms. Hagerbommer and Ms. Hill made observations throughout the relevant period that didn't necessarily describe limitations in this area. I believe even during one of the hospitalizations, she was interacting with groups and peers. The ALJ also cited other examples, such as her ability to shop in stores, to travel to New York, and to attend family events. So the ALJ did find a number of serious social limitations, but adequately explained why she didn't assess more. But still help me understand what kind of job you think this woman would be qualified for. Putting aside the limitations that I just adverted to you by the physicians that you said supported the commissioner's position, the ALJ says she had to avoid work that requires joint effort and have no contact with the public. Give me an example of a job that would fit that criteria. Well, again, in this case, in all social security cases, it's the vocational expert's job generally to provide those jobs. And in this case, the vocational expert did provide three examples. Again, those are- Those are hand packager, laundry worker, and industrial cleaner. Correct. And in those jobs, you'd have to get instruction from a supervisor, but you would never be interacting with members of the public. Yes, that's at the vocational- How do we know that? Well, because that's what the vocational expert testified, and that testimony went unchallenged. So that's the record we have. It was appropriate for the ALJ to rely on that testimony in this case. I'll just briefly address some of the other limitations in the record. The main elder category of limitations was, again, about maintaining a schedule. Again, there was a conflict in the evidence there. Ms. Long found that- Dr. Long found that she could maintain a schedule. Dr. Mirza submitted an opinion which indicated she had marked limitations in this area, but, as the ALJ pointed out, Dr. Mirza also didn't complete the rest of the form, didn't complete the form asking exactly how often she would be absent or off task. And the ALJ identified a number of reasons for finding this opinion inconsistent with the record, and substantial evidence supports that determination. So, overall, this is a case with conflicting evidence, but it's not a case where the ALJ improperly picked out a few isolated instances of normal mental status findings, and then relied on them to the exclusion of all other evidence. Would you concede that this woman has substantial mental health issues? Would that be a fair characterization of the record? Yes, and the ALJ recognized that by finding that she had a number of severe mental impairments, and then went on to assess limitations. But the ALJ, again, the ALJ considered the fluctuations in her functioning throughout time, but then contrasted the evidence of the hospitalizations with evidence that her symptoms quickly stabilized each time, and that for most of the relevant period. She wasn't just denying symptoms, but on the occasion when she was denying current symptoms, her mental status functions were, her mental status exams were generally normal, normal mood, affect, thought process, attention, and concentration, and at least fair insight and judgment, no suicidal ideation. The ALJ also considered that she was otherwise maintaining the same level of treatment, medication, and activity throughout the relevant period. And ultimately, it was the ALJ's responsibility to resolve the conflicting evidence in the record, and arrive at an RFC that adequately accounted for all that evidence. Even if the record could also support a different conclusion, a reasonable fact finder would not have to reach a different conclusion than the ALJ, and for that reason, the court should defer to the ALJ at the RFC, and the Step 5 finding, and affirm. Thank you very much. Ms. Holchen, we'll hear back from Mr. Gorton on rebuttal. Thank you, Your Honor. Very briefly, it is the RFC that's the problem. Zero absenteeism. It's not a matter of whether she can do the job. Can she do it and never miss a day, considering that she's 17 days in the hospital, 10 times to the emergency room, doesn't count that, in her bed? Can she do it and not be off task 10%? As they said, Dr. Long, up to moderate impairments, even doing simple tasks, 10%. It's clearly more, and clearly does not capture the limitations dealing with others. She can deal with normal supervision. Yeah, she cuts herself, she hits herself with a ceramic bowl, she threatens to kill other people, she stays in her room. She can't deal with other people, and it's not a matter of the tasks. The ALJ says she can't do complex tasks with others. It's not a matter of the tasks. It's a matter of the people. Thank you, Your Honors. Just one question again. I'm not exactly clear whether what you're asking us to do beyond have the ALJ do the case over. Right. There are two things you can ask. Why? I mean, it's a substantial evidence test. I'm sorry, forgive me. One more time, Judge. The test, as we all know, is substantial evidence. And so what is it that you think the ALJ needs to do that he or she failed to do before? Correct. Give the proper residual function capacity evaluation. Put in the RFC, and quite honestly, before doing that, send it to- You think the determination of her abilities was correct, but the RFC didn't match up with it? Say it one more time, Judge. The determination that she could do simple tasks and all of that was correct, but you think the RFC itself was the error? Inadequate. Correct. It's inadequate. It has zero time off tasks. It has zero absenteeism. It has no limitation working with supervisors. It has no limitation temporarily working with coworkers. It has none. It says she can't do a complex- Does it have a limitation on working with coworkers because it's about working alone, right? No. She said that she can't do complex tasks with others. So I have a job and I have three other people I have to deal with. Well, in a hand-packed jury, you still have this one here who's joking about whatever. This one here who might say, hey, you're stupid. Hey, you're being slow. Where would you have that? Say again? Where would you have that? In any job. In any job, you have somebody there. You have some supervisors. You have somebody saying something that you and I wouldn't even blink at, and it drives her gone. So when the administrative law judge and what he should do- Do you think that the ALJ was compelled to conclude that she couldn't ever be in the presence of other people? I think the ALJ, based on the evidence- I mean, we have some evidence, right? I mean, Dr. Joriga says she was doing well until her boyfriend moved into the neighborhood, and she was upset about that. I don't need to list them, but there was some evidence that she could deal with other people, right, to a limited extent. She can deal with other- Somebody else might walk by her while she's doing it. That's not what I said. What I said is that she does do well until she explodes. The problem is if there's somebody there and one time they say something one time, she can't do it. If she then obsesses about it and she doesn't go into work, then there are no jobs. If she's thinking about it and off task 10% of the time, there are no jobs. If she has to deal, the supervisor has to be there at some point during the probationary period. She has to have much more supervision, and there were no limitations at all. So, yes, we believe that there is no view of the evidence that- But in addition to your contention that the RFC is an enemy, what else? It's that she can't work. I mean, that's the obvious, is that somebody who's in the hospital for 17 days, somebody who goes to the emergency room 10 other times, which is the tip of the iceberg, somebody who stays home because somebody looked at them funny or said something funny, wants to blow her aunt's head off because her aunt said something probably meaningless, wants to stab her boyfriend, hits herself with a ceramic ball- I think we got that argument. Okay. Thank you very much, Mr. Gordon. The case is submitted.